STATE of Utah, Plaintiff and Appellee,

v.

Debra BROWN, Defendant and Appellant.

No. 960041.

Supreme Court of Utah.

Oct. 24, 1997.

Jan Graham, Atty. Gen., J. Frederic Voros, Jr., Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

John T. Caine, Ogden, and Shannon R. Demler, Logan, for defendant and appellant.

RUSSON, Justice:

Defendant Debra Brown was convicted by a jury in Cache County of aggravated murder. Brown appeals her conviction, claiming that (1) the trial court incorrectly barred admission of the results of a polygraph exam-

ination; (2) the trial court's failure to intervene when the prosecutor made certain comments during his closing arguments was plain error; and (3) the evidence was insufficient to support the jury's verdict.

## I. BACKGROUND

█ On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. *State v. Johnson,* 821 P.2d 1150, 1153 (Utah 1991).

On the morning of November 7, 1993, the Logan City Police Department received a 911 call from defendant stating that she had found her employer dead in his home. Both emergency medical personnel and police officers responded to the call. Upon arrival, the officers found Debra Brown, who was emotionally distraught, on the porch outside the home. Inside, they found the body of Lael Brown,[1] who had been shot in the head. Mr. Brown was in his bed with a blanket and a sheet pulled up to his shoulder. Initially, police thought the death might have been a suicide; however, when they did not find a gun, they began treating the investigation as a murder.

Debra Brown told police investigators she had worked for Lael Brown in his apartment rental business. She stated that Mr. Brown had been ill and she had delivered a pot of soup to his home on Saturday afternoon, November 6. When she knocked on the door and received no answer, she left the soup on Mr. Brown's porch with a note. She returned Sunday morning to check on Mr. Brown and found the soup still on the porch. Again there was no response to her knocks on the door. At that point, she returned to her truck, retrieved a key to Mr. Brown's home, and let herself into the home, where she discovered his body and then called the police. The pot of soup with the note was still on the porch when police officers arrived.

Investigators determined that there had not been a forced entry into the home nor was the house ransacked. Items of value such as the television and various guns that were in plain view were also still in the home.

The only obviously missing item was Mr. Brown's wallet. Police officers questioned Debra Brown several times that day and searched her truck and her purse.

An autopsy revealed that Mr. Brown had been shot three times with a .22 caliber handgun, and tests suggested that the murder weapon may have been a Colt Woodsman. Police learned that Mr. Brown owned a .22 caliber Colt Woodsman handgun that was missing. Neither the Colt Woodsman nor any other murder weapon was ever found.

An analysis of Mr. Brown's home revealed traces of blood around the kitchen sink and a small hand print on the front door. Police never matched the hand print to Debra Brown, and no traces of blood were found on her clothes. No physical evidence linking Debra Brown to the murder was ever discovered.

However, when Mr. Brown's family began working on his estate for probate purposes, they discovered that his October 1993 bank statement and several canceled checks were missing. They also discovered that several checks written in the preceding months were missing. This discovery made the family suspicious because Mr. Brown was known for keeping complete financial records. Upon further investigation, police determined that the missing checks from prior months were payable to Debra Brown. They also learned that several checks written to Debra Brown had cleared the bank during the month of October. When police obtained copies of these checks from the bank, they suspected that several of the checks payable to Debra Brown were forgeries. An expert document examiner evaluated copies of the checks along with other financial records and confirmed the forgeries. Defendant's home was searched, but none of the missing financial records were ever located. When the bank issued the November statement, police found that another forged check payable to Debra Brown had been negotiated on November 2.

On the basis of a neighbor's statement about hearing gunshots, police thought the murder occurred at approximately 7 a.m. on

---

1. Lael Brown and Debra Brown are not related.

Saturday, November 6, 1993. Defendant could account for her whereabouts for the entire weekend except the hours between 6:40 a.m. and 10 a.m. on Saturday, November 6.

Throughout the investigation, Debra Brown willingly cooperated with investigators. She was interviewed by police officers more than twenty times in the three months following the murder and consistently denied involvement.

Defendant was charged by information with aggravated murder on September 12, 1994. On appeal, she (1) challenges the trial court's ruling barring admission of polygraph results, (2) claims the trial court erred when it failed to address the prosecutor's remarks during closing argument, and (3) challenges the sufficiency of the evidence.

## II. POLYGRAPH

■ During the investigation and prior to being charged, defendant voluntarily consented to a polygraph examination requested by the Logan City Police Department. In the course of this examination, the following colloquy between the examiner and Brown transpired:

Q. Regarding the question about Lael's death, do you intend to tell the truth to each question about that?

A. Yes.

Q. Did you yourself cause Lael's death?

A. No.

Q. Did you conspire with anyone to cause Lael's death?

A. No.

Q. Do you know for sure who caused Lael's death?

A. No.

Before trial, Brown sought a court order allowing testimony about the results of the polygraph. The district court, after hearing the parties' proffers, denied Brown's request

and, in fact, granted the State's request barring mention of the polygraph examination at trial. Brown claims that the court erred in refusing to allow testimony about the polygraph examination.

■ "The trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard." *State v. Larsen,* 865 P.2d 1355, 1361 (Utah 1993). "[T]he exercise of discretion ... necessarily reflects the personal judgment of the court and the appellate court can properly find abuse only if ... no reasonable [person] would take the view adopted by the trial court." *State v. Gerrard,* 584 P.2d 885, 887 (Utah 1978).

■ *State v. Rimmasch,* 775 P.2d 388 (Utah 1989), sets forth a three-part standard for admitting scientific evidence under Utah Rule of Evidence 702.[2] *Rimmasch* first requires a threshold showing of inherent reliability. *Id.* at 398. A proponent may either show a general acceptance of the principle or technique in the relevant scientific community or proffer a sufficient foundation to demonstrate the inherent reliability of the underlying principles and techniques. *Id.* at 400. If the proponent can show general acceptance, the court may take judicial notice and admit the evidence subject to the requirements discussed below. *Id.* However, if the subject is not suitable for judicial notice, the

foundational showing must explore with careful precision such questions as the correctness of the scientific principles underlying the testimony, the accuracy and reliability of the techniques utilized in applying the principles to the subject matter before the court and in reaching the conclusion expressed in the opinion, and the qualifications of those actually gathering the data and analyzing it.... Only with such information can the overall decision on admissibility be made intelligently. In the ab-

---

2. Our recent decision in *State v. Crosby,* 927 P.2d 638 (Utah 1996), decided while this appeal was pending, reaffirmed *Rimmasch* and our interpretation of the admissibility of scientific evidence (specifically, the admissibility of polygraph examinations) in light of *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125

L.Ed.2d 469 (1993). Inasmuch as *Crosby* reaffirms the *Rimmasch* standard and does not add any further requirements to *Rimmasch,* this opinion will address Brown's concerns under *Rimmasch.* The reader is referred to *Crosby* for a full discussion of the interrelationship of *Daubert, Rimmasch,* and polygraph evidence.

sence of such a showing by the proponent of the evidence and a determination by the court as to its threshold reliability, the evidence is inadmissible.

*Rimmasch,* 775 P.2d at 403; *see also Phillips v. Jackson,* 615 P.2d 1228, 1233–36 (Utah 1980).

■ If the proponent can satisfy this threshold requirement of inherent reliability, only then need the court consider the remaining two steps. *Id.* at 398 n. 7. *Rimmasch's* second requirement is a "determination that there is an adequate foundation for the proposed testimony, i.e., that the scientific principles or techniques have been properly applied to the facts of the particular case by qualified persons and that the testimony is founded on that work." *Id.*

■ Finally, if the court is satisfied regarding this second determination, it must balance the probative value of the proffered evidence against the dangers its admittance poses under rule 403 of the Utah Rules of Evidence. *Id.* at 398 n. 8. *Rimmasch* also points out that "when the inferences from the scientific evidence sweep broadly or cut deeply into sensitive areas, a stronger showing of probative value should be required. Such a 'sensitive area' is one central to the core of the fact-finding process—whether one witness or another is telling the truth." *Id.* at 399 n. 8 (citations omitted).

■ Our past cases make clear that at the present time, the admission of polygraph evidence is not appropriate for judicial notice.[3] *See State v. Eldredge,* 773 P.2d 29, 37 (Utah 1989) (requiring stipulation for admission of polygraph results). In the absence of a sufficient foundational showing of inherent reliability and satisfaction of the remaining two prongs of *Rimmasch,* a stipulation between the parties is the only way polygraph evidence may be admitted. Thus, Brown was required to lay the foundation by presenting evidence of inherent reliability. "[T]he burden is on the party proffering the evidence to demonstrate that it has the requisite degree of reliability." *Rimmasch,* 775

P.2d at 407. Preliminary questions concerning the admissibility of evidence should be established by a preponderance of proof. *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. at 2796 n. 10.

The parties submitted the issue to the court only on briefs outlining their positions and proffers made to the judge in chambers; no evidentiary hearing was held. In support of admission, Brown proffered the testimony of the administering polygrapher, claiming he would testify that Debra Brown had been truthful. In addition, the defense offered an affidavit from Dr. David Raskin, a noted polygraph authority, and the testimony of a Davis County Sheriff's office polygraph expert. Brown stresses that the Logan City Police Department requested the examination and, when she voluntarily submitted to the examination, she had neither been charged with any crime nor consulted an attorney.

In opposition to admission, the State proffered the testimony of David Liken of the University of Minnesota, claiming that he would testify about problems with the test. The State also claims that the police did not use the polygraph as a means for detecting truth but as an aid in an attempt to obtain a confession. The State argues that there was no evidentiary hearing on this matter.

■ In the absence of an evidentiary hearing, an initial question is whether the record before this court contains a sufficient reflection of the proffers. Although an evidentiary hearing would have created a more complete record for review, a hearing is not required per se so long as the parties sufficiently document their proffers to the court. In view of the record and the briefs filed with this court, we are convinced that Brown failed to proffer any recent studies either showing a wider acceptance of the polygraph in the scientific or legal communities or revealing information that would lend itself to a finding of inherent reliability.

---

**3.** *See also Crosby,* 927 P.2d at 642–43 (noting that in other jurisdictions polygraph evidence either is inadmissible per se or requires a stipulation). *But see State v. Tillman,* 750 P.2d 546, 557 (Utah 1987) (developments in area of polygraph examinations may in future progress to point where polygraph tests should be held admissible irrespective of stipulation).

Brown states that the polygrapher would have testified that he conducted the exam using all appropriate standards, that he was an experienced polygrapher, and that his findings were reliable. While confidence in the methodology and reliability of his examination is important (supporting *Rimmasch*'s second requirement), this fails to explain with sufficient precision any *reason* for its reliability or how the test meets the requirements of Utah Rule of Evidence 702. Similarly, Dr. Raskin would have testified as to the reliability of the test under proper conditions and with proper training of the polygrapher. This proffer has been submitted to courts previously, and Brown fails to state Dr. Raskin's intention of presenting the court with recent studies that shed new light on the polygraph in a forensic setting.

On the basis of Brown's representations, neither of these witnesses would have been able to meet the inherent reliability standard. Further, the fact that the Logan City police requested the polygraph or that Brown had not been charged and had not consulted an attorney adds nothing to the question of the inherent reliability of the polygraph.

On appeal, Brown directs our attention to *United States v. Posado,* 57 F.3d 428 (5th Cir.1995), as holding that advances in polygraph technique have made it sufficiently reliable. Our reading of *Posado* does not support Brown's position. In *Posado,* the defendants sought to introduce polygraph evidence in support of their motion to suppress. The district court "summarily refused to consider the polygraph testimony and also refused to consider whether the testimony was reliable and relevant." *Id.* at 431. Defendant Posado appealed, claiming that *Daubert* required a hearing on the admissibility of the polygraph evidence. *Id.*

The Fifth Circuit, however, recognized that its precedent barring polygraph evidence per se did not survive *Daubert. Id.* at 429. The court, "with a high degree of cau-

tion," remanded on the issue of admissibility and required the district court to conduct a full *Daubert* hearing. *Id.* at 436. Contrary to Brown's claims, the *Posado* court specifically did not express any opinion whether polygraph evidence possesses sufficient evidentiary reliability and relevance to be admissible or whether the polygraph is scientifically valid. *Id.* at 429, 434.[4]

Brown also claims that the judge did not follow the *Crosby* standards in considering her motion to admit the polygraph evidence. However, Brown concedes in her brief that the trial court relied primarily on *Rimmasch* in determining the polygraph evidence was inadmissible. At the time the district court considered the matter, *Crosby* had not been decided and *Rimmasch* was our most recent statement of the law. Thus, the trial judge correctly followed existing law. Moreover, as already stated, *Crosby* did not change the *Rimmasch* standard.

In his memorandum decision, the district judge recognized that there is no general acceptance of the polygraph, and he discussed several areas of concern including methodology, reliability, and the risk at trial of focusing on the credentials of the experts. The court also discussed the third step of *Rimmasch,* that is, the danger of unfair prejudice under Utah Rule of Evidence 403. "[T]he Rules of Evidence—especially Rule 702—do assign the trial Judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. at 2798. We find that the trial court properly applied the *Rimmasch* tests and that the district court did not abuse its discretion in refusing to admit the polygraph results.

## III. PROSECUTOR'S COMMENTS DURING CLOSING

■ Brown claims that the prosecutor made certain comments during his closing

---

4. On remand in the *Posado* matter, the trial court held that the polygraph evidence was inadmissible, citing problems with reliability, relevance, and rule 403. *United States v. Ramirez,* 1995 WL 918083 (S.D.Tex. Nov.17, 1995). We also note that Fifth Circuit cases after the *Posado* decision rejected admission of the polygraph. *See, e.g.,*

*United States v. Zertuche–Tobias,* 953 F.Supp. 803, 807 (S.D.Tex.1996) (citing problems with both reliability and methodology); *United States v. Dominguez,* 902 F.Supp. 737 (S.D.Tex.1995) (subjectivity of procedure involved is concern to court).

rebuttal that improperly shifted the burden of proof and called the jury's attention to her decision not to testify. At trial, defense counsel chose not to object to these comments for "strategic reasons." On appeal, Brown claims that the court's failure to respond to the prosecutor's statements sua sponte is plain error. The State claims that Brown's failure to object at trial waived her right to appeal this issue.

■■■ Generally, we will review objections raised for the first time on appeal for plain error. Utah R. Evid. 103(a)(1); *State v. Eldredge*, 773 P.2d 29, 35 (Utah), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989). However, *State v. Bullock*, 791 P.2d 155, 158–59 (Utah 1989), *cert. denied*, 497 U.S. 1024, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990), raises an exception where counsel strategically chooses not to object:

> [W]e do not appraise all rulings objected to for the first time on appeal under the plain error doctrine.... *[I]f a party through counsel has made a conscious decision to refrain from objecting* or has led the trial court into error, *we will then decline to save that party from the error....* The necessity for an appellate court's following such an approach is obvious when the consequences of the alternative are considered. If trial counsel were permitted to forego objecting to evidence as part of a trial strategy that counsel thinks will enhance the defendant's chances of acquittal and then, if that strategy fails, were permitted to claim on appeal that the Court should reverse because it was plain error for the court to admit the evidence, we would be sanctioning a procedure that fosters invited error. Defendants are thus not entitled to both the benefit of not objecting at trial and the benefit of objecting on appeal.

*Id.* (citations omitted) (emphasis added). Circumstances like these are precisely why "courts are not required to constantly survey or second-guess the nonobjecting party's best interests or trial strategy." *State v. Labrum*, 925 P.2d 937, 939 (Utah 1996). If trial counsel intentionally fails to object, the trial judge is put in the untenable position of deciding whether to intervene and potentially interfere with trial counsel's strategy or face review for plain error.

The plain error rule exists to permit review of trial court rulings as a way of protecting a defendant from the harm that can be caused by less-than-perfect counsel. But the purpose of that rule is in no way implicated if defense counsel consciously elects to permit evidence to be admitted as part of a defense strategy rather than through inadvertence or neglect.

*Bullock*, 791 P.2d at 159 (citations omitted). It is "our long-established policy that the trial court should have the first opportunity to address the claim of error." *State v. Dunn*, 850 P.2d 1201, 1220 (Utah 1993). We in no way dictate the appropriate strategy for the trial attorney to pursue in any given situation.[5] Since Brown strategically chose not to object, we decline to review for plain error.

## IV. SUFFICIENCY OF THE EVIDENCE

■■■ Brown's final claim is that the evidence was insufficient to support the jury's finding that she murdered Lael Brown either in the commission of a burglary or for pecuniary gain. In considering an insufficiency of the evidence claim,

> we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury. We reverse a jury conviction for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he [or she] was convicted.

*State v. Petree*, 659 P.2d 443, 444 (Utah 1983). "As we have often said, credibility is an issue for the trier of fact, in this case the jury.... Moreover, as a general rule, in reviewing a jury verdict we assume that the jury believed the evidence supporting the

---

5. This court will not review for error a trial attorney's strategic decisions unless the error falls below the standard of reasonable professional practice. *See Dunn*, 850 P.2d at 1220.

verdict." *Dunn*, 850 P.2d at 1213. "We note that the trial court considered defendant's insufficiency of the evidence claim in denying the motion for a new trial. This action lends further weight to the jury's verdict." *Johnson*, 821 P.2d at 1156. Brown faces a high hurdle in establishing this claim.

Brown was charged with aggravated murder. Thus, the State had the burden of proving beyond a reasonable doubt that Brown intentionally or knowingly caused the death of another under circumstances where at least one of several aggravating factors listed in the statute are present. Utah Code Ann. § 76–5–202 (Supp.1994). The State relied on two aggravating factors: (1) commission of a homicide while the defendant was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit burglary, Utah Code Ann. § 76–5–202(1)(d) (Supp.1994); and/or (2) commission of a homicide for pecuniary gain. Utah Code Ann. § 76–5–202(1)(f) (Supp.1994).

▮ Initially, we note that there was no direct evidence that Debra Brown committed the murder. The State's case was based solely on circumstantial evidence. However, a conviction can be based on sufficient circumstantial evidence. *See State v. Rebeterano*, 681 P.2d 1265, 1267 (Utah 1984). In such a case, we must

> determine (1) whether there is any evidence that supports each and every element of the crime charged, and (2) whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove each legal element of the offense beyond a reasonable doubt. A guilty verdict is not legally valid if it is based solely on inferences that give rise to only remote or speculative possibilities of guilt.

*State v. Workman*, 852 P.2d 981, 985 (Utah 1993).

▮ There is no dispute that whoever murdered Lael Brown did so intentionally. Mr. Brown was shot three times in the head from close range, each shot being potentially fatal. Clearly, there was sufficient evidence to establish that Lael Brown's death had been intentionally or knowingly caused.

In determining whether defendant was involved in this murder, the jury was required to consider all the evidence before it, along with the logical and reasonable inferences that could be drawn therefrom. The jury had the following evidence to consider:

(1) There were no signs of a forced entry into Mr. Brown's home or any signs of a struggle or fight in the home. Police officers found the back door secured from inside the home, and there was no indication that it had been opened. Mr. Brown always kept his doors locked, and the front door locked automatically whenever it closed.

(2) There were only two known keys to the house—Mr. Brown's key, which was found in his pants pocket, and the key Debra Brown had. Indeed, Debra Brown told police officers that she gained access to Mr. Brown's home with her key when she claimed to have discovered the body. While defendant raised questions regarding others who may have had keys to Mr. Brown's home and whether Mr. Brown may have willingly let his killer into his home, there was no evidence in this regard, and the fact remains that Debra Brown had a key and thus had access to Mr. Brown's home.

(3) Debra Brown was an employee and a friend of Lael Brown and had been in his home often. In fact, on one occasion when Mr. Brown was on vacation, Debra Brown thoroughly cleaned and painted Mr. Brown's home.

(4) Mr. Brown was shot with a .22 caliber handgun. An expert testified that from an examination of the bullets that killed Lael Brown, the murder weapon may have been any one of several different brands and models of guns, including a .22 caliber Colt Woodsman. Mr. Brown owned a Colt Woodsman that was reported missing after the murder. The same brands of bullets that killed Mr. Brown were found in a drawer in his bedroom.

(5) The medical examiner testified that the time of death was likely between 9 p.m. Friday, November 5, and 3 a.m. Sunday, November 7. He based his testimony on physical findings and evidence that Mr.

Brown was last seen alive Friday evening, November 5; that he failed to follow his usual routine of visiting with friends at a local restaurant Saturday morning; that he did not answer his telephone from as early as 9:30 a.m. Saturday; and that his truck was seen parked in his driveway all day Saturday although no one saw him working around his home, which was his usual routine.

(6) The defense was unable to establish Debra Brown's whereabouts for the period between 6:40 a.m. on Saturday, when defendant was heard leaving a friend's house, where she had spent the night, and 10 a.m. on Saturday, when Debra Brown's son saw his mother when he awoke. The defense established the whereabouts of Debra Brown for the remaining period when the murder could have occurred.

(7) A neighbor who lived just behind Mr. Brown testified that she heard two "pops" that she believed to be gunshots on Saturday at approximately 7 a.m. The neighbor said she heard these shots as she brought her head up out of the water while bathing. The defense presented testimony from Mr. Brown's next door neighbor, a former police officer, who testified that he heard no gunshots that morning. This neighbor was waking his family early Saturday morning in preparation for a family outing.

(8) The only property missing from Mr. Brown's residence were his October bank statement and canceled checks, several canceled checks from previous months, his .22 caliber Colt Woodsman, and his wallet. Copies of the October bank statement and canceled checks obtained from the bank revealed that several checks were made payable to defendant but were, in fact, forgeries, i.e., someone had traced Lael Brown's signature onto these checks.

(9) Bank representatives testified that the October statement was mailed to Mr. Brown prior to his death. The postmaster testified that given the potential mailing dates, it was ninety-seven percent likely that Lael Brown had received the statement and canceled checks before he was last seen alive.

(10) Mr. Brown was fastidious with his financial records. His son testified that he was able to reconstruct Mr. Brown's entire financial history dating back to the 1970s. Family members and several of Mr. Brown's friends testified that Mr. Brown would likely have confronted someone who violated his trust and he would likely have gone to the police.

(11) In Debra Brown's original statement to the police, she stated that she had left the soup on Mr. Brown's porch because she did not want to disturb him. However, in a later statement, she stated she left the soup on the porch because she thought he was not home and she did not want to go inside.

(12) Police officers testified that when they arrived at Mr. Brown's residence, Debra Brown was emotionally distraught. A neighbor who looked after defendant immediately after the discovery testified similarly. Debra Brown's boyfriend, who came to the scene shortly after the discovery, also testified that she was very upset.

■ From this evidence, the jury found defendant guilty of aggravated murder, that is, that she intentionally killed Lael Brown while committing burglary and/or killed him for pecuniary gain. Since no one saw defendant shoot the victim, and since the murder weapon has never been found, such finding had to be based upon the evidence and the reasonable inferences drawn therefrom. "A jury may choose which, among several reasonable inferences, to believe." *Workman*, 852 P.2d at 987. In reviewing the evidence, we conclude that it was not unreasonable for the jury to infer from the evidence the following:

(1) Because Lael Brown's residence was intact, without signs of forced entry, whoever killed him gained entrance either by the use of a key or by Lael Brown's opening the door himself. And since there were no signs of struggle or a fight within the residence, and since Lael Brown was found dead in his bed, it is likely that entrance to the house was gained by someone who had a key and that Lael Brown was shot while asleep or before he could react.

(2) Because the medical examiner determined that Lael Brown was killed sometime between 9 p.m. on Friday and 3 a.m. on

Sunday and a neighbor heard the sound of gunshots at about 7 a.m. on Saturday, Lael Brown was shot around 7 a.m. on Saturday.

(3) Because the make and model of Lael Brown's missing gun were consistent with the possible murder weapon and the bullets that killed him were the same brands he used, Lael Brown was killed with his own gun.

(4) Because defendant had been in Lael Brown's home on many occasions, at least once to clean and paint while Mr. Brown was away, she was in a position to have known where Mr. Brown kept his guns and his financial papers.

(5) Because the only items stolen from Lael Brown were his wallet, his hand gun, and the October bank statement containing canceled checks, including several checks payable to defendant that were found to be forgeries, and because no other property was missing, the person removing those items from the home would have had a personal interest in them, and defendant, because of the forgeries, had a personal interest in obtaining those canceled checks.

(6) Defendant gave inconsistent statements to the police. She originally informed them that she had left soup on Mr. Brown's porch because she did not want to disturb him. Later, she stated that she had left the soup on the porch because she thought he was not at home and did not want to go inside. It was not unreasonable for the jury to wonder why in either case she would leave soup on the porch where it could go bad instead of leaving it inside in the refrigerator since she had a key to enter the residence.

(7) The defense could not account for defendant's whereabouts at about 7 a.m., when the neighbor heard the gunshots, but was able to explain her whereabouts prior to 6:40 a.m. on Saturday and after 10 a.m. on Saturday.

(8) Because Lael Brown and defendant were the only two persons known to have keys to the house and it was likely that whoever killed Lael Brown entered by opening the door with a key, defendant was that person.

In view of all the evidence and the reasonable inferences drawn therefrom, it was not unreasonable for the jury to have found that defendant had stolen from Lael Brown since she benefited directly from the forged checks, that she had a motive to kill Lael Brown because he was likely to go to the police when he discovered the checks, that she knew of the existence of Mr. Brown's gun, that she took the gun and, while he was asleep, shot him dead at about 7 a.m. (when she could not account for her whereabouts and when the neighbor heard gunshots), that she then departed with the financial records and the gun that incriminated her, and that such constituted the intentional taking of a human life during a burglary and/or for pecuniary gain in violation of the law. Thus we cannot say that the evidence was so inconclusive and inherently improbable that the jury could not have found that each element of the crime had been established beyond a reasonable doubt.

## V.  CONCLUSION

For the foregoing reasons, we affirm the conviction.

ZIMMERMAN, C.J., and HOWE and DURHAM, JJ., concur in Justice RUSSON's opinion.

STEWART, Associate C.J., dissents.

STEWART, Associate Chief Justice, dissenting:

In my view, we should revisit the admissibility of polygraph evidence. That has not been done with any degree of careful assessment of the state of the art of polygraphy or, more importantly, of its potential for helping to eliminate undetectable error in the subjective assessment of a defendant's credibility on the basis of the defendant's demeanor. There is no scientific basis whatsoever, that I am aware of, for concluding that judges or juries are able to make unerringly valid judgments as to credibility on the basis of demeanor, notwithstanding the long-held assumption, and even presumption, that they can do so. Indeed, what evidence there is strongly suggests frequent error. Surely, there is no paucity of evidence in legal litera-

ture to the effect that horrendous mistakes have been made from time to time because of faulty credibility assessments.

Although polygraph test evidence is not foolproof, it is a mistake to assume that all scientific evidence is. *See, e.g., Kofford v. Flora,* 744 P.2d 1343 (Utah 1987). Moreover, polygraph evidence is more like an expert's opinion based on a generally accepted technique or test than a scientific test based on principles of physics, chemistry, or another hard science. In truth, courts admit much expert opinion based on statistical correlations, standardized psychological tests, and even an expert's own practical or clinical experience.

I think a defendant, and perhaps the prosecution, should have the right under certain circumstances to use the result of such a test, rather than having credibility decided solely on the basis of a nonreviewable, highly subjective judgment as to one's demeanor. It is noteworthy that *State v. Crosby,* 927 P.2d 638 (Utah 1996), indicated that the issue has not been disposed of for all time.