2002 UT App 366

**STATE of Utah, Plaintiff and Appellee,**

v.

**Troy Lynn SCHULTZ, Defendant and Appellant.**

**No. 20010775–CA.**

Court of Appeals of Utah.

Nov. 7, 2002.

---

Linda M. Jones and Lisa J. Remal, Salt Lake Legal Defender Association, Salt Lake City, for Appellant.

Mark L. Shurtleff, Attorney General, and Kenneth A. Bronston, Assistant Attorney General, Salt Lake City, for Appellee.

Before DAVIS, ORME, and THORNE, JJ.

## OPINION

DAVIS, Judge.

¶ 1 Defendant Troy Lynn Schultz (Schultz) appeals his conviction of arson, a third degree felony, in violation of Utah Code Ann. § 76–6–102(1)(b) (1999). Schultz argues that the trial court erred by allowing expert testimony concerning the use of canine accelerant detection. We affirm.

## BACKGROUND [1]

¶ 2 On August 6, 2000, Ms. Teresa Villegas took her three daughters and two sons in the family's van to pick up her husband at the restaurant where he worked. She went inside the restaurant with her daughters and left her sons in the van to watch TV. Approximately fifteen minutes later, a person knocked on the window of the restaurant and stated that a van was burning. When Ms. Villegas exited the restaurant, a man jumped from the roof of the building and landed close to her.

¶ 3 Meanwhile, a witness observed a brief fight between three individuals, one of whom was Schultz. Prior to the fight, Schultz exited a bar that was connected to the restaurant, another bar, and a barber shop. After the fight, Schultz remained outside and appeared to be looking on the ground for something. The witness then heard Schultz say, "I'm going to get you guys." A few minutes later, the witness saw a cloud of black smoke and believed that the bar was on fire. He also observed Schultz on the roof of the building appearing to place a cloth into a

---

1. We view and recite the facts in a light most favorable to the jury verdict. *See State v. Loose,* 2000 UT 11, ¶ 2, 994 P.2d 1237.

ventilation duct. The witness ran across the street, saw Schultz jump off the roof, and began chasing him.

¶ 4 Another witness observed the cloud of black smoke and decided to drive his motorcycle to the scene. Schultz ran past him and the witness heard a person yell, "Get him." The witness chased Schultz and, during the chase, Schultz allegedly stopped and faced the witness with a knife in his hand. The witness knocked the knife out of Schultz's hand and ripped Schultz's shirt. Schultz then took off. Shortly thereafter, the police apprehended Schultz. While the witness was speaking with one of the police officers, he overheard Schultz say that he "didn't mean to catch the van on fire," and that it was an accident.

¶ 5 A third witness was driving down the street and observed the van on fire. She saw a man standing next to the van. Just prior to trial, the witness was shown pictures of Schultz and determined that the man in the picture looked "very familiar ... [and] quite a bit like the gentleman that I had seen." The witness's twelve-year-old daughter saw a man "throwing like a rag, or a white napkin into the van." The daughter believed that the pictures of Schultz also looked like the man she had seen by the van, but she could not say for sure.

¶ 6 Officer Lisa Pascadlo was on duty and also observed a black cloud of smoke. Upon arriving at the scene, the officer was told by witnesses that a van had been set on fire with possibly two children inside. The witnesses described the suspect and told the officer the direction he had gone. The officer then met Schultz, who matched the description provided by the witnesses, and, after some struggling, placed him in custody. While in custody, Schultz stated that he "didn't mean to do it" and that he "didn't mean to hurt anybody."

¶ 7 Schultz was charged with aggravated arson, arson, and aggravated assault. The aggravated arson charge was subsequently dismissed.

¶ 8 During a motion hearing, the State requested that a dog named "Oscar," used by the Salt Lake Fire Department for fire investigation, be allowed in the courtroom during his handler's testimony so that the jury could view "[h]is mannerisms" and judge "his credibility as to ... the accuracy of his sniffs and detection." Schultz challenged Oscar's presence as irrelevant but the court ruled that Oscar could be present in a limited manner—i.e., not all day.

¶ 9 Prior to trial, Schultz raised concern that the State's experts—Jeffrey Long, Rex Nelson, and Jennifer McNair—would testify as to whether "a canine's smelling abilities are better than a lab's abilities" and that a sufficient foundation may not be established for such evidence. Schultz also expressed concern that a dog handler would be unable to properly compare a dog sniff with a lab test and believed that an expert in veterinary science or forensic use of dogs was more appropriate.

¶ 10 During trial, the State called Jeffrey Long to testify. Mr. Long is a chief investigator for the Fire Investigation Bureau with the Salt Lake City Fire Department. He testified that he had arrived at the van fire scene and began to investigate the fire. He further testified that he initially could not locate a point of origin but noticed some unusual burn patterns and determined that the fire had burned too fast and that there was too much damage for the amount of time the van was occupied. Mr. Long testified that he then requested the assistance of Investigator Rex Nelson and Oscar to help detect the presence of an accelerant.[2] Oscar made two alerts. Mr. Long took samples from the areas where Oscar alerted. Oscar then hit again on the same areas. After Oscar alerted, Mr. Long continued his investigation and acknowledged the V patterns[3] and the collapsed roof as indications of the origin of fire in the area where Oscar alerted.

2. Accelerants include ignitable liquids that act to accelerate a fire and include gasolines, kerosenes, charcoal lighter fluids, newspaper, or flash paper.

3. V patterns occur when air is drawn from underneath and the fire burns up and out, giving a V-shaped pattern.

¶ 11 Based upon the information at the fire scene, Mr. Long concluded that the fire was intentionally set. He based his conclusion on burn patterns, wood underneath the carpeting in the van, the time involved, the fast growth of the fire, and the absence of a fuel load.

¶ 12 While testifying, Mr. Long discussed investigative techniques and the process for determining the origin and cause of fires. He acknowledged that canine accelerant detectors are used as investigative tools, specifically noting that "the canine is just a tool. It's no different than the shovel, ... a trowel[,] or a visual or witnesses." Mr. Long testified that the canine is used to help investigators determine the area of a fire's origin and find out "why that fuel is there and what it's doing." Once the dog makes an alert, investigators take a sample and submit it to the Utah State Crime Lab. During his testimony, Mr. Long read from the National Fire Protection Association 921: Guide for Fire and Explosion Investigations (2001) (the 921), a fire investigation guide from which new fire investigators are tested. Particularly, he noted that the 921 specifies that

> [t]he proper use of detection canines is to assist with the location of [a] selection of samples. In order for the presence or absence of an ignitable liquid to be scientifically confirmed in the sample, that sample should be analyzed by a laboratory. . . . Any canine alert not confirmed by laboratory analysis should not be considered validated.

In addition, Mr. Long stated that there are times when a dog will alert to an area but a subsequent laboratory test will not detect an accelerant. Mr. Long also noted the 921 suggests canine detection should be used in conjunction with other fire investigation techniques and not as a replacement. Furthermore, he testified as to studies conducted by Dr. J.D. DeHann concerning canine accelerant detection teams. Upon cross-examination, Mr. Long acknowledged an article that analyzed a test conducted between 1992 and 1994 that found accuracy rates among canines to be between 50% and 82%.

¶ 13 Schultz objected to Mr. Long's testimony concerning the 921's discussion of canines, the use of canines as an investigative tool, and the olfactories of a canine. He also challenged the qualifications of Dr. DeHann because the studies were not conducted by veterinarians. Schultz further objected to Mr. Long relying on studies that lacked "proper expertise [in] that you would have to be a veterinarian and have special training in the area of fire investigation." The trial court overruled Schultz's objections and ruled that the expertise of Mr. Long was sufficient and that a veterinarian was not necessary.

¶ 14 Oscar's handler, Rex Nelson, is an investigator for the Salt Lake County Fire Department and was called to testify about Oscar's training. He noted that Oscar underwent imprinting at the Bureau of Alcohol, Tobacco, and Firearms for six weeks, that Mr. Nelson underwent training for five weeks, and that Oscar receives additional training seven days a week. Mr. Nelson stated that prior to entering a fire scene, Oscar is calibrated, meaning that his nose is checked by placing a scent on an item and asking Oscar to find the odor. He also testified that Oscar will hit on an accelerant, sit, and stay until fed. Mr. Nelson then places pressure on the leash to make sure it is not a false positive.

¶ 15 Mr. Nelson testified that at this particular fire scene, Oscar made two alerts. Mr. Nelson then conducted a discrimination line [4] where Oscar accurately hit on the previously alerted samples. The next day, Oscar alerted to Schultz's socks and shoes, but not to his shorts.

¶ 16 Jennifer McNair, an employee of the State Crime Laboratory, testified that tests conducted on the samples from the canine alert, Schultz's socks, and Schultz's shoes did *not* detect any ignitable liquid residue. Although the shoes tested positive for toluene, a solvent used to dissolve paint or other plastics but also used as a glue in shoes, Ms.

---

4. A discrimination line helps eliminate false positives by placing two samples of fire debris from areas not alerted to, together with alerted samples, having the canine run through all the samples, and determining if the dog accurately hits the samples and not the distractors.

McNair testified that she believed that the toluene came from the glue in Schultz's shoes.

¶ 17 At the conclusion of the trial, the jury found Schultz guilty of arson and not guilty of aggravated assault. Schultz appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 18 Schultz contends that the trial court erred in allowing the State to admit testimony into evidence concerning the use of a canine to detect an accelerant at the scene of the fire and that such testimony lacked foundation and was admitted in violation of *State v. Rimmasch*, 775 P.2d 388 (Utah 1989). The trial court's decision to admit expert scientific or technical evidence is reviewed under an abuse of discretion standard. *See Brewer v. Denver & Rio Grande W. R.R.*, 2001 UT 77, ¶ 16, 31 P.3d 557.

## ANALYSIS

### I. Preservation of the Issue

¶ 19 Preliminarily, the State argues that Schultz failed to preserve the issue below. "To preserve a substantive issue for appeal, a party must first raise the issue before the trial court." *Hart v. Salt Lake County Comm'n*, 945 P.2d 125, 129 (Utah Ct.App. 1997). "A matter is sufficiently raised if it is submitted to the trial court, and the court is afforded an opportunity to rule on the issue." *Id.* (quotations and citation omitted). Thus, an issue must be "raised in a timely fashion," must be "specifically raised such that the issue is sufficiently raised to a 'level of consciousness' before the trial court," and must be supported by evidence or relevant legal authority. *Id.* at 130 (citations omitted).

¶ 20 Here, defense counsel raised concern about the presence of Oscar in the courtroom during the handler's testimony, about the State's experts testifying about the superior ability of canine accelerant detection over laboratory analysis, and about the experts testifying beyond the scope of their expertise, specifically contending that a veterinarian or forensic expert was more appro-

priate. Furthermore, Schultz objected to testimony concerning the 921's discussion of canines, the use of canines as an investigative tool, and the olfactories of a canine. He also objected to Mr. Long's reliance on studies that were not conducted by veterinarians with special training in fire investigation. The trial court overruled Schultz's objections and determined that the expertise of Mr. Long was sufficient and that a veterinarian was not necessary. Because Schultz challenged the testimony of the experts concerning canine accelerant detection and the trial court had the opportunity to rule on the issue, the issue was properly preserved below.

### II. Canine Accelerant Detection Evidence

¶ 21 Schultz's main contention on appeal is that the trial court erred in allowing Mr. Long and Mr. Nelson to testify concerning canine accelerant detection. A trial court has broad discretion in determining the admissibility of expert scientific evidence. *See State v. Brown*, 948 P.2d 337, 340 (Utah 1997). In addition, the admissibility of expert testimony is governed by rule 702 of the Utah Rules of Evidence, which provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Utah R. Evid. 702. However, if an expert testifies as to scientific evidence that is based upon novel methods or techniques, a separate threshold reliability test must be met. *See Franklin v. Stevenson*, 1999 UT 61, ¶ 13, 987 P.2d 22; *State v. Rimmasch*, 775 P.2d 388, 397–403 (Utah 1989). If the reliability test is not met and the methods or techniques are deemed unreliable, any expert testimony based upon such techniques is also considered unreliable and therefore inadmissible. *See Franklin*, 1999 UT 61 at ¶ 18, 987 P.2d 22.

¶ 22 Thus, the question before us is whether canine accelerant detection is novel scientific[5] evidence.[6] Scientific methods or tech-

---

5. One court has held that testimony concerning the comparable use of canines for scent-tracking does not involve scientific devices, processes, or theories. *See Brooks v. People*, 975 P.2d 1105, 1111–12 (Colo.1999).

6. We decline to compare the reliability and relevancy of canine accelerant detection to unrelated types of evidence, such as polygraph evidence or eyewitness identification, that have been found to

niques are not considered novel if they are "of the sort that ha[s] 'attained general acceptance in ... the relevant scientific community.'" *Patey v. Lainhart*, 1999 UT 31, ¶ 16, 977 P.2d 1193 (ellipsis in original) (citation omitted). If scientific testimony is not based on novel scientific principles or techniques, the *Rimmasch* test is not implicated. *See id.; see also State v. Adams*, 2000 UT 42, ¶ 16, 5 P.3d 642 (recognizing that *Rimmasch* is not intended to apply to all expert testimony but only for testimony "based on *newly discovered principles*" (quotations and citation omitted)).[7] Instead, the testimony must simply comply with rule 702 by assisting the trier of fact in understanding evidence or determining a fact in issue. *See Adams*, 2000 UT 42 at ¶ 17, 5 P.3d 642. Under rule 702, the key question is " 'whether, on balance, the evidence will be helpful to the finder of fact.'" *Campbell v. State Farm Mut. Auto. Ins. Co.*, 2001 UT 89, ¶ 86, 432 Utah Adv. Rep. 44, (quoting *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993)), *cert. granted*, 122 S.Ct. 2326 (2002). "Helpfulness depends on 'whether the subject is within the knowledge or experience of the average individual.'" *Id.* (quoting *Larsen*, 865 P.2d at 1361).

¶ 23 In *Fones v. State*, 765 So.2d 849 (Fla. Dist.Ct.App.2000), the testimony of a fire investigator/handler of an accelerant detection canine was introduced. *See id.* at 850. The investigator concluded that accelerants had been used "based on his own personal investigation and observations." *Id.* No accelerants were found on a sample taken from the fire scene. *See id.* The court concluded that the testimony was based on "scientific principle ... sufficiently established to have gained general acceptance in the field of arson investigation." *Id.* Thus, the "use of dogs to detect accelerates [was] not a new or novel scientific principle." *Id.*

■ ¶ 24 Similarly, we conclude that the use of canines to help detect the presence of accelerants as an investigative tool is generally accepted within the fire investigation community. *See Fitts v. State*, 982 S.W.2d 175, 183 (Tex.App.1998) (recognizing that training and technique for canine accelerant detection is accepted by arson investigation community); *see also* NFPA 921: Guide for Fire and Explosion Investigations (2001); Jonas & Bueker, *Accelerant Detection Canines: Uses and Misuses* (1999), *available at* http://www.nciaai.com/Sym.htm. Therefore, expert testimony concerning the use of canines as a fire investigation technique to determine whether an accelerant may be present is merely subject to rule 702, rather than the three-part *Rimmasch* test.

¶ 25 In applying rule 702, it is clear that testimony concerning fire investigation techniques would be helpful to the trier of fact in understanding causes, origins, or patterns of fire or in determining if a fire was intentionally set.[8] In addition, the average individual does not have sufficient knowledge or experience in fire investigative techniques or the use of canines to help detect accelerants. Thus, testimony or evidence of canine detection and other fire investigation tools can

---

be either admissible or inadmissible. In addition, we decline to make any distinction between the admissibility of expertise based on the hard sciences and "experience-based specialized knowledge." *See Brooks v. People*, 975 P.2d 1105, 1111, 1114 (Colo.1999) (finding canine scent-tracking evidence reviewable under conventional rule 702 and rule 403 analysis).

7. There seems to be some confusion as to whether the *Rimmasch* test is limited in application to only scientific or technical evidence that is based on novel principles or techniques. *See State v. Mead*, 2001 UT 58, ¶ 40, 27 P.3d 1115 (applying *Rimmasch* three-prong test for "deciding wheth-

er evidence is admissible under rule 702"); *State v. Crosby*, 927 P.2d 638, 642 (Utah 1996) (stating that *Rimmasch* sets forth the proper standard for admitting scientific evidence under rule 702).

8. For example, a fire investigator could explain the process used, including the utilization of a canine accelerant detector, in reaching a conclusion of whether a fire was arson or accidental. Utah courts have recognized that experts "must be allowed to explain the foundation for [their] opinion." *See Patey v. Lainhart*, 1999 UT 31, ¶ 33, 977 P.2d 1193 (noting that "[m]uch of what experts rely upon in formulating opinions is inadmissible evidence").

assist a trier of fact in understanding evidence or determining a fact in issue. *See Adams,* 2000 UT 42 at ¶ 17, 5 P.3d 642; *see also State v. Buller,* 517 N.W.2d 711, 713 (Iowa 1994) (noting that evidence of accelerant detection dog's reaction at fire scene is type of specialized information that will assist trier of fact).

¶ 26 On the other hand, if testimony concerning canine detection is used as substantive proof that an accelerant was used in a fire, without laboratory confirmation, such evidence is based on novel scientific principles or techniques. Only a handful of courts have specifically addressed this issue. In *People v. Acri,* 277 Ill.App.3d 1030, 214 Ill.Dec. 761, 662 N.E.2d 115 (1996), the issue was whether dog alerts were more reliable than laboratory tests. *See id.* at 116. The court determined that there was "no 'general acceptance' of the reliability of uncorroborated alerts in the field of arson investigation." *Id.* at 117. Thus, dog alerts not confirmed by laboratory analysis would be inadmissible. *See id.* The Georgia Supreme Court held that dog alerts were not sufficiently scientifically reliable to permit their use as substantive evidence of the presence of accelerants. *See Carr v. State,* 267 Ga. 701, 482 S.E.2d 314, 318 (1997), *overruled on other grounds, Clark v. State,* 271 Ga. 6, 515 S.E.2d 155 (1999). Finally, in *Farm Bureau Mutual Insurance Co. v. Foote,* 341 Ark. 105, 14 S.W.3d 512 (2000), the court deemed testimony concerning canine accelerant detection to be novel scientific expert testimony. *See id.* at 520. The testimony concerned the fire investigation dog's superior ability to detect the presence of accelerants. *See id.* In addition, the expert relied upon authority that a dog's nose was more sensitive than laboratory equipment. *See id.* at 519. Thus, in each of these cases, canine accelerant detection evidence was offered as substantive proof independent of laboratory testing.

■ ¶ 27 We agree with the reasoning of these courts and determine that substantive evidence of canine accelerant detection in the absence of laboratory testing is novel scientific evidence. Under Utah law, as novel scientific evidence, substantive evidence of ca-

nine accelerant detection requires a three-step analysis to determine admissibility. *See State v. Crosby,* 927 P.2d 638, 640–41 (Utah 1996). First, expert scientific or technical testimony must be inherently reliable. *See Rimmasch,* 775 P.2d at 396. To demonstrate inherent reliability, "a showing of general acceptance" is generally sufficient, *id.* at 396–97 (quotations and citations omitted), or a proponent must "proffer a sufficient foundation to demonstrate the inherent reliability of the underlying principles and techniques." *Brown,* 948 P.2d at 340. The trial court can then either take judicial notice and admit the evidence or require a foundational showing that explores questions of "the correctness of the scientific principles underlying the testimony, the accuracy and reliability of the techniques utilized in applying the principles to the subject matter before the court and ... the qualifications of those actually gathering the data and analyzing it." *Id.* Thus, "the trial court should carefully explore each logical link in the chain that leads to the expert testimony given in court and determine its reliability." *Rimmasch,* 775 P.2d at 403.

¶ 28 The second step requires the trial court to determine "that the scientific principles or techniques at issue have been properly applied to the facts of the particular case by sufficiently qualified experts." *Crosby,* 927 P.2d at 641.

¶ 29 Step three requires the trial court to "determine whether the proffered scientific [or technical] evidence will be more probative than prejudicial as required by rule 403 of the Utah Rules of Evidence." *Id.* If the underlying principles and techniques of scientific evidence are inherently reliable and have been properly applied to the case at issue by qualified experts, " 'dangers of unfair prejudice, confusion of the issues, misleading the jury, etc .... would have to be great indeed to preclude its admission.' " *Id.* (citation omitted).

■ ¶ 30 Schultz challenges the testimony of Mr. Long and Mr. Nelson concerning canine accelerant detection as unreliable and lacking foundation, argues that the State failed to present evidence concerning Oscar's performance specifically and in general, and

contests the probative value of the evidence versus its prejudicial effect. We decline to engage in an application of the *Rimmasch* factors to this case because the trial court's admission of the evidence was harmless.

¶ 31 Schultz contends that the testimony concerning canine accelerant detection was prejudicial and requires a reversal of his conviction.[9] The State argues that any error in admitting the evidence was harmless since independent evidence of Schultz's guilt was overwhelming. To determine if an evidentiary error is harmless, we look at " 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *State v. Kiriluk,* 1999 UT App 30,¶ 11, 975 P.2d 469 (citation omitted). Thus, we will not reverse a conviction " 'unless the error is substantial and prejudicial in the sense that there is a reasonable likelihood that in its absence there would have been a more favorable result for the defendant.' " *State v. Burns,* 2000 UT 56,-¶ 35, 4 P.3d 795 (citations omitted).

¶ 32 Here, the jury convicted Schultz of third degree felony arson. As part of the State's evidence, Mr. Long testified that, as a result of his investigation, he concluded that the fire of the van was intentionally set. His conclusion was based upon burn patterns, the wood underneath the carpet, the time involved in the burn, the fast growth of the fire, and the absence of a fuel load.

¶ 33 Notably, Mr. Long's determination that the fire was arson was not reached on the basis of Oscar's alert. Although Oscar assisted Mr. Long in determining the point of origin, there was other evidence that led to such a result, specifically the V patterns and collapsed roof. Thus, Oscar did not provide any independent evidence of arson. Oscar merely helped Mr. Long focus his investigation to determine the point of origin. The point of origin was then independently confirmed by separate and distinct evidence. In addition, Oscar's alert was not even a factor in Mr. Long's final conclusion that the fire was caused by arson.

¶ 34 Furthermore, Mr. Long directly testified that the fire investigation guide upon which all new fire investigators are tested directly states that "[a]ny canine alert not confirmed by laboratory analysis should not be considered validated." Ms. McNair also testified that the laboratory results were negative. Such testimony basically negates the evidentiary value of Oscar's alert.

¶ 35 The jury easily could have based its decision to convict upon evidence entirely independent of the testimony concerning Oscar's accelerant detection, such as Mr. Long's fire investigation results and eyewitness testimony. *Cf. Green v. Louder,* 2001 UT 62,-¶ 29, 29 P.3d 638 (holding that excluding expert testimony was harmless and did not affect the jury verdict because the subject matter of the testimony was only one factor and "by no means a determinative one"); *see also United States v. Marji,* 158 F.3d 60, 62 (2d Cir.1998) (noting that even if decision to allow expert testimony was erroneous, "there was substantial additional evidence . . . that an accelerant was used by the defendant"); *Carr,* 482 S.E.2d at 318 (finding harmful error because no other evidence of arson existed); *People v. Dix,* 242 A.D.2d 912, 662 N.Y.S.2d 879, 879 (N.Y.App.Div.1997) (finding failure to lay proper foundation for accelerant-sniffing dog evidence harmless since proof of guilt was overwhelming and there was no significant probability that error contributed to defendant's conviction); *State v. Simpson,* 2002 Ohio 3717,¶ 78 (Ohio Ct.App. 2002) (holding that even without testimony of handler of dog used for accelerant detection there was other evidence of accelerant); *Commonwealth v. Gwynn,* 555 Pa. 86, 723

9. Schultz cites cases where courts found prejudice when the case rests "on the jury's resolution of conflicting evidence" or on circumstantial evidence. *State v. Byrd,* 937 P.2d 532, 536 (Utah Ct.App.1997); *see State v. Andreason,* 718 P.2d 400 (Utah 1986). In this situation, there is neither seriously conflicting evidence nor does the case rest upon remote or limited circumstantial evidence. For example, several eyewitnesses observed Schultz at the scene and he was immediately apprehended within the vicinity. Also, Mr. Long was able to conclude that the fire was intentionally set based upon several investigative factors. This is not a case that comes " 'down to a one-on-one situation,' " *Byrd,* 937 P.2d at 536 (citation omitted), or where "factors other than the evidence before [the jury]" determined Mr. Schultz's guilt or innocence. *Andreason,* 718 P.2d at 403.

A.2d 143, 152 (1998) (stating that trial court did not abuse discretion in admitting dog's reactions and, even if court did, admission was not prejudicial because of testimony of other witnesses concerning the use of gasoline), *cert. denied,* 528 U.S. 969, 120 S.Ct. 410, 145 L.Ed.2d 320 (1999). Schultz has not demonstrated that there would have been a more favorable result as to undermine confidence in the jury verdict if the expert evidence had been excluded. *See Adams,* 2000 UT 42 at ¶ 23, 5 P.3d 642. Therefore, the admission of the expert testimony of Mr. Long concerning Oscar's alerts and of Mr. Nelson, Oscar's handler, is harmless.

¶ 36 Finally, Schultz challenges the studies and the 921 evidence relied upon by Mr. Long during his testimony since he did not participate or observe the studies. Schultz also argues that Dr. DeHann's qualifications should have been addressed because he was the "true expert." Rule 703 of the Utah Rules of Evidence provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Utah R. Evid. 703. Thus, " '[o]nce [an] expert is qualified by the court, the witness may base his [or her] opinion on reports, writings, or observations not in evidence which were made or compiled by others, so long as they are of a type reasonably relied upon by experts in that particular field.' " *Campbell,* 2001 UT 89 at ¶ 89 (third alteration in original) (citation omitted); *see also State v. Kelley,* 2000 UT 41,¶ 23, 1 P.3d 546 (finding it unnecessary "for experts to have perceived all aspects of their testimony personally"); *State v. Clayton,* 646 P.2d 723, 726 (Utah 1982) (stating that reports, publications, and treatises may be included within the "scope of the special knowledge" of a qualified expert). In addition, "[t]he opposing party may challenge the suitability or reliability of such materials on cross-examination, but such challenge goes to the weight

to be given the testimony, not to its admissibility." *Campbell,* 2001 UT 89 at ¶ 89.

¶ 37 In *Clayton,* 646 P.2d at 725, an expert testified as to the statistical probability of matching two hair samples and made reference to "the studies of others." The court noted that the witness, on direct examination, exposed a weakness in assigning probability figures. *See id.* at 727. In addition, the defendant had "ample opportunity to explore this weakness in cross-examination" and could have "challenged the testimony with his own materials or witnesses on the subject of the reliability of [the evidence]." *Id.*

■ ¶ 38 As an expert, Mr. Long could properly rely on the authority of the 921 and Dr. DeHann's studies to formulate his opinion. The 921 is regularly relied upon by fire investigators, as evidenced by Mr. Long's testimony that all new fire investigators are tested from the guide. Although Mr. Long did not expressly state that Dr. DeHann's studies were relied on by experts in the fields of fire investigation and canine accelerant detection, we assume such studies to be proper materials upon which Mr. Long could base his opinion because Schultz had the opportunity to cross-examine Mr. Long to challenge the authority. In fact, Schultz did have Mr. Long acknowledge another article in which tests were conducted to determine the accuracy rate for canine accelerant detection. Schultz did not question the expertise of the individuals who conducted those studies. Thus, Schultz took advantage of the opportunity to cross-examine Mr. Long on the authority relied upon by Mr. Long in formulating his opinion and, similar to *Clayton,* had the opportunity to explore any weaknesses in the use of canine accelerant detection, especially when Mr. Long testified that alerts are not valid if not confirmed by laboratory testing. Therefore, Mr. Long could rely on the 921 and Dr. DeHann's studies to support his testimony.

## CONCLUSION

¶ 39 We hold that the trial court did not abuse its discretion by admitting the testimony of Mr. Long and Mr. Nelson concerning canine accelerant detection. Typically, such evidence will be admissible under rule 702 if

helpful to the trier of fact. However, if testimony about canine detection is offered as substantive proof of the presence of an accelerant, without laboratory confirmation, the three-part analysis of *Rimmasch* is required because such evidence is based on novel scientific principles and methods.

¶ 40 Even if the trial court erred in admitting the testimony in this case, there was no prejudice to Schultz because there was a significant amount of other evidence to support his conviction for arson.

¶ 41 I CONCUR IN THE RESULT: GREGORY K. ORME, Judge.

THORNE, Judge (concurring in part and concurring in the result):

¶ 42 I agree with Judge Davis's conclusion that the trial court did not err in permitting the State's expert to discuss the activities of the accelerant detecting dog. The expert testified that he had used the dog merely as an investigative tool to assist him in arriving at a conclusion concerning the cause and origin of the fire. As suggested by Judge Davis, such reliance is clearly permissible under rule 703 of the Utah Rules of Evidence. Moreover, while the actions of the dog *may not be* themselves admissible evidence, there is no question that in the course of testifying an expert is permitted to explain the basis for his opinion. *See State v. Kelley*, 2000 UT 41, ¶ 18, 1 P.3d 546.

¶ 43 However, in the face of Judge Davis's conclusion that the expert's reliance on the dog does not implicate *State v. Rimmasch*, 775 P.2d 388 (Utah 1989), I cannot agree with his decision to then discuss the reliability factors articulated in *Rimmasch*. *See id.* at 398–99. I would prefer to limit our analysis to the confines of rules 702 and 703, and defer addressing the reliability of accelerant detecting dogs to another day.

¶ 44 Similarly, I see no need to conclude that the trial court committed error in admitting the evidence, regardless of how harmless the effect. The trial court properly permitted the expert to testify concerning the basis for his conclusion that the fire was the result of arson. Furthermore, while the trial court may have permitted testimony that was not necessary concerning the dog's training regimen, I cannot see how this was error.

¶ 45 Accordingly, I concur in Judge Davis's opinion only to the extent that I believe that the behavior of the dog was properly discussed under rule 703 and was not admitted as substantive evidence.