**2016 UT App 164**

## THE UTAH COURT OF APPEALS

HERBERT LANDRY,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20140638-CA
Filed July 29, 2016

Fourth District Court, Provo Department
The Honorable Steven L. Hansen
No. 100402172

Cory A. Talbot and M. Benjamin Machlis, Attorneys
for Appellant

Sean D. Reyes and Erin Riley, Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGE
MICHELE M. CHRISTIANSEN and SENIOR JUDGE PAMELA T.
GREENWOOD concurred.[1]

ORME, Judge:

¶1      Herbert Landry appeals the district court's order
dismissing his petition for postconviction relief from his
conviction for one count of aggravated arson. Landry's theory is
one of layered ineffective assistance of counsel. He alleges that
he received ineffective assistance from his appellate counsel in
his direct appeal when appellate counsel failed to raise the issue
of ineffective assistance rendered by his trial counsel. Landry

---

1. Senior Judge Pamela T. Greenwood sat by special assignment
as authorized by law. *See generally* Utah R. Jud. Admin. 11-
201(6).

asserts that trial counsel rendered ineffective assistance by failing to object to the State's use of testimony about an accelerant-detection canine's alerts at the scene of the fire and on items of his clothing and by failing to consult with an arson expert or to call an expert witness to refute the State's arson experts. We conclude that such failings, taken together, constitute prejudicial ineffective assistance. Thus, we reverse the district court's contrary disposition and remand for a new trial or the fashioning of such relief as is appropriate under the circumstances. *See* Utah Code Ann. § 78B-9-108(1)(b) (LexisNexis 2012).

BACKGROUND

¶2     The salient facts were developed in an evidentiary hearing on Landry's postconviction petition, and we take the district court's findings of fact as our starting point. We also rely on our prior decisions in Landry's unsuccessful direct appeal, *State v. Landry*, 2008 UT App 461U, and his successful appeal from the district court's denial of an evidentiary hearing on his postconviction petition, *Landry v. State*, 2012 UT App 350, 293 P.3d 1092, as well as the record from Landry's original trial.

¶3     Landry moved into an apartment complex in Provo, Utah, in September 2005. From September 2005 until he was evicted from his apartment in February 2006, he split his time between Provo and Texas, where his family lived. Landry arranged to vacate his apartment on February 26, 2006, and to conduct a final walk-through inspection with the apartment complex manager at 9:00 p.m. that evening.

¶4     On the day of the scheduled inspection, Landry and his girlfriend were in his bedroom, packing. While there, his girlfriend sat on the edge of the bed and smoked a cigarette. In the afternoon, the two left, apparently intending to return. Some of Landry's belongings remained behind, including clothes,

some small furniture items, a mattress, floor coverings, and a suitcase that contained clothes, prescription medications, and financial documents. Neighbors saw the pair leave in a hurry. Some five to ten minutes later, around 4:30 p.m., the same neighbors observed smoke coming from Landry's apartment and called 911 to report a fire. Around this same time, another neighbor observed an unidentified man outside Landry's apartment. Fire investigators were unable to locate that individual, but they did find a discarded lighter nearby.

¶5      During their investigation of the fire, police used a certified accelerant-detection canine named Oscar. Oscar alerted his handler to possible ignitable substances on the floorboards in three places in Landry's bedroom, and investigators determined the bedroom to be the point of the fire's origin. Investigators then sent samples from each of those three locations to the crime lab. The crime lab concluded that heptane was the only ignitable substance that could be present on the floorboard samples. According to the district court's findings, heptane is an ingredient in "a common construction adhesive that is often used to glue carpet down and to glue the components of a sub-floor," and at trial the State conceded that heptane was not the cause of the fire. Oscar was also taken to the motel room where Landry had moved many of his belongings. Oscar alerted to one of Landry's socks and one of his shoes. The crime lab subsequently tested Landry's clothing, including the shoe and sock, and found no ignitable substances.

¶6      In addition to Oscar's alerts, investigators identified a distinct v-pattern on the floor of Landry's bedroom, which indicated, as one investigator testified at trial, that this was "an intentionally set fire from the ignition of ignitable poured liquid." Police interviewed Landry, who did not attempt to explain the cause of the fire or express concern about the possessions left in his bedroom. Landry agreed during the interview that the fire was likely not due to accidental electrical or chemical causes. He denied smelling smoke or other odors

consistent with fire at the time he left the apartment with his girlfriend. He also said there were no tobacco products or other smoking materials in his bedroom. Following its investigation, the State charged Landry with aggravated arson, a first degree felony. *See* Utah Code Ann. § 76-6-103(2) (LexisNexis 2012).

¶7     During the ensuing two-day jury trial, the State's case included testimony regarding Oscar's training and the meaning of his alerts as well as expert testimony regarding the cause and origin of the fire. First, Oscar's handler, himself a fire investigator, testified that Oscar was trained to "find[] ignitable liquids, the typical type of liquid that you'd find in . . . a hardware store, for instance, kerosene, Coleman fuel, lighter fluid, charcoal lighter gasoline is the most common type of accelerant[] that he's trained on, kerosene." But Oscar was not trained to alert to alcohol. On direct examination, when asked if "the fact that Oscar [alerted] on an odor necessarily means that there's an ignitable liquid there," the handler replied that "[t]here are times when he's alerted and it comes back not identifiable hydrocarbon."[2] But on cross-examination the handler testified that when the lab determines a sample contains no identifiable hydrocarbon, "[i]t doesn't necessarily mean there is nothing there, there may . . . have been but they couldn't

---

2. "In the field of arson and fire investigations, combustible vapors or vapors resulting from accelerants and ignitable liquid residues are often referred to as 'Hydrocarbons.' These hydrocarbons are a by-product of the original petroleum based material that may have been used as the original ignitable liquid residue used to start the incendiary fire (e.g., gasoline, kerosene)." Matthew D. Baldwin, *Practical Applications of Hydrocarbon and Photoionization Detection Units in Arson Investigations*, Crime Scene Investigator Network (Feb. 25, 2015), http://www.crime-scene-investigator.net/practical-applications-of-hydrocarbon-and-photoionization-detection-units-in-arson-investigations.html [https://perma.cc/3RWQ-LW7K].

identify what it was." And according to the district court on remand, Landry's trial counsel "elicited testimony" from the handler "that a general rule of thumb is that the error rate is probably in the range of 10%." During his trial testimony, the Provo City fire marshal stated, "[T]he dog is much more sensitive than some of the scientific equipment that we use." The district court later found that "[f]ar from accepting the Crime Lab's findings, the State used them instead to bolster the evidence regarding Oscar's alerts," pointing to the Provo fire marshal's testimony in particular.

¶8    At trial, the State also put on expert testimony from the Orem City and Provo fire marshals regarding the origin and cause of the fire. The Orem fire marshal testified that the fire "beg[a]n at the floor level" and that the burn marks created a v-pattern, which he explained occurs when combustion materials separate from the air around them and which directed the investigators to what they believed was the point of origin. He testified that "the patterns on the floor were indicative of a poured or flowing liquid that had been on the floor and ignited[,] causing increased damage in the specific areas on the floor consistent with ignitable poured liquid." Despite conceding that he found no accelerants or ignitable liquids in Landry's bedroom, the Orem fire marshal persisted in testifying that "this was an intentionally set fire that occurred from the ignition of ignitable poured liquid." He also refuted a defense theory advanced by trial counsel—that a lit cigarette that inadvertently came into contact with spilled alcohol could have caused the fire—by pointing to Landry's denial that smoking materials were in his bedroom and his failure to mention spilled alcohol during his initial interview with investigators and by saying that he believed there would have been an explosion that was visible to witnesses if that had been the cause. The Provo fire marshal also testified that the patterns on a piece of subfloor introduced into evidence resulted from "an ignitable liquid that was poured or otherwise distributed" on Landry's bedroom floor.

¶9    Landry's trial counsel called no witnesses to refute the State's experts' testimony regarding the investigation methods and the cause and origin of the fire. Trial counsel instead defended Landry by suggesting that Landry did not set the fire—at least not intentionally. In support of the theory that the fire was an accident, Landry testified that he hosted a party in his apartment the night before the fire and that alcohol was spilled in the general area where the experts testified that the fire had started. This was the first time that Landry mentioned anything about a party or spilled alcohol. He further testified, contradicting his pretrial statements to investigators, that his girlfriend was smoking on the bed shortly before the fire started. Again, this was the first time Landry had mentioned this fact. And when asked on cross-examination for specific details about the party and his girlfriend, Landry could provide none—not even his girlfriend's last name. But apparently hoping to plant the seed of reasonable doubt, trial counsel suggested in her closing argument that the cigarette could have fallen into the alcohol or onto the bed and started the fire.

¶10    In support of the defense theory that whatever the cause of the fire, Landry was not it, trial counsel also called a neighbor who testified that around four o'clock on the afternoon of the fire he heard a knock, apparently on Landry's door, and then saw a man who was "[k]ind of tall, narrow, had glasses, goatee, shaggy beard" and wearing "dark clothes, dark hat," and whom the neighbor previously had seen "around." Ten minutes later the neighbor saw that cardboard used as Landry's temporary front window had been pushed in. And at 4:30, he saw the fire. Police never located the unidentified man. Hoping to create a reasonable doubt in the mind of the jury, trial counsel suggested in closing argument that the unidentified man may well have started the fire.

¶11    And at least some doubt apparently existed in the jurors' minds. After closing arguments, the jury deliberated for several hours and was at one point deadlocked. *State v. Landry*, 2008 UT

App 461U, para. 3 n.1. After the jury informed the trial court of the deadlock, the court explained that the jury would have to return and continue deliberations the following day. When faced, however, with the prospect of having to return the next day to continue their deliberations—potentially extending the trial, which was initially scheduled for two days, to an unexpected third day and causing at least one juror a hardship— the jurors asked for the opportunity to reconvene briefly that night. Only then did they reach a consensus and return a guilty verdict.

¶12   Landry appealed his conviction, and on direct appeal, appellate counsel argued "that there was insufficient evidence to convict [Landry] of the crime charged." *Id.* para. 1. This court affirmed. *Id.* Landry then filed the instant petition for relief under the Post-Conviction Remedies Act (PCRA), Utah Code Ann. §§ 78B-9-101 to -405 (LexisNexis 2012), raising a number of theories, including ineffective assistance of appellate counsel. *See Landry v. State*, 2012 UT App 350, ¶¶ 1, 4–5, 293 P.3d 1092. Landry's postconviction petition asserted that his appellate counsel was ineffective for her failure to raise trial counsel's ineffectiveness as an issue on direct appeal. *Id.* ¶ 1. The State moved to dismiss the postconviction petition, and the district court granted the State's motion. *Id.* ¶ 5. On appeal, "[w]e reverse[d] and remand[ed] for an evidentiary hearing . . . on the limited issue of whether appellate counsel was ineffective when [she] did not raise on direct appeal the ineffective assistance of trial counsel." *Id.* ¶ 1. We affirmed as to Landry's other postconviction issues. *Id.*

¶13   The district court held the required evidentiary hearing. Landry presented testimony from trial and appellate counsel, and both Landry and the State presented expert testimony assessing the expert testimony from his trial as well as addressing the likely cause of the fire.

¶14 Trial counsel testified in a deposition, the recording of which was played during the evidentiary hearing, that although she had "been to CLEs that touched on arson," she did not recall participating in any other arson cases and did not "have any personal training in arson." Despite her inexperience, trial counsel consulted only the Provo fire marshal, who was the State's expert and who would later testify on behalf of the State. Moreover, she admitted that she "didn't rebut their expert testimony at trial" or present any evidence supporting a nonarson theory. She acknowledged that her defense strategy rested on the possibility that a lit cigarette could have fallen into spilled alcohol and started the fire, or alternatively, that an unidentified man may have started the fire. Trial counsel also stated that it did not occur to her to challenge the testimony regarding Oscar's alerts as improper expert testimony, or to its "coming in at all."

¶15 Landry elicited testimony that appellate counsel, like trial counsel, did not consider it problematic that trial counsel relied exclusively on consultation with the State's expert witness and did not consult an independent arson expert. Furthermore, appellate counsel testified that she did not review *State v. Schultz*, 2002 UT App 366, ¶¶ 26–29, 39, 58 P.3d 879 (limiting the admissibility of accelerant detection canine alerts), as a part of her preparation, even though the State cited the decision in its brief on appeal. She did, however, testify that if she had reviewed *Schultz*, she would have argued plain error, ineffective assistance of trial counsel, and that the State's introduction of Oscar's alerts as substantive evidence was improper under *Schultz*.[3]

---

3. In its conclusions of law, the district court disregarded counsel's testimony that she overlooked *State v. Schultz*, 2002 UT App 366, 58 P.3d 879, because the court concluded that Oscar's alerts were not substantive evidence of the presence of accelerants. But when Oscar's handler testified to the presence of

(continued…)

¶16   Also during the evidentiary hearing on remand, Landry and the State relied on arson experts, who prepared reports and testified. The State's expert said the fire was properly classified as arson, while Landry's expert concluded that the fire could not definitely be classified as arson and instead should have been classified as of "undetermined origin." The experts focused much of their testimony on whether the fire investigators properly conducted the investigation. Based on their testimony, the district court found that it was unclear whether the investigators used the fire-investigation guide NFPA 921[4] in investigating this particular fire, which guide both experts relied

---

(…continued)

accelerant on Landry's sock and shoe even though the laboratory had not corroborated those alerts, he was citing Oscar as the source of the evidence without satisfying the test for expert testimony—a conclusion that the State does not refute. We conclude that the handler's testimony regarding Oscar's alerts was substantive evidence—all the more so given the Provo fire marshal's contention that Oscar was more "sensitive" than some scientific equipment and the district court's characterization of the crime lab results as being used "to bolster the evidence regarding Oscar's alerts." *See supra* ¶ 7.

4. The NFPA 921 is a guide for "scientific-based investigation and analysis of fire and explosion incidents . . . [and] the foremost guide for rendering accurate opinions as to incident origin, cause, responsibility, and prevention." *NFPA 921: Guide for Fire and Explosion Investigations*, National Fire Protection Association, http://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards?mode=code&code=921 [https://perma.cc/FNR5-DZWQ]. It is used in the field and by courts. *Id.* The experts who testified in the evidentiary hearing on remand both agreed NFPA 921 is a leading guide for arson investigators.

upon as authoritative in their own reports. The experts also agreed, the court found, that "the [S]tate's original fire investigators made a mistake when they concluded that fire patterns on the floor definitely indicated a pour pattern for ignitable liquids."

¶17    The State's expert believed the v-pattern could have been from poured ignitable fluid, but he indicated that conclusion could not be substantiated because the fire was characterized by "full room involvement." The district court found that Landry's expert was similarly unwilling to rule out the possibility that the fire started because of ignitable liquids, but he believed any such liquids were on the mattress, not the floor. Landry's expert testified that the mattress was the "first fuel ignited in this fire" and pointed to the common role cigarettes play in starting home fires as a potential cause.

¶18    The district court further found that the experts disagreed about whether the original investigators properly conducted their investigation. According to the court's findings, Landry's expert first said the investigators failed to identify the arrangement of the bedroom, did not consider "target and secondary fuels," did not "identif[y] the volume or fire load," and "failed to identify [the] type or heat release rate" of each of the fuels present in the room. The State's expert disagreed with each of these conclusions. Regarding the heat release rate, the State's expert acknowledged that there was no documented proof that the State's trial experts considered the heat release rates, but he opined that they still could have considered them. Landry's expert also said the investigation was flawed because the investigators failed to conduct a full electrical arc survey, while the State's expert was not troubled by that decision because such a survey is not the only way to identify a fire's point of origin. Landry's expert further criticized the investigation because the investigators did not conduct a complete reconstruction of the bedroom, but the State's expert said this was unnecessary as the original investigators left the

items in the room and relied on photographs and Landry's characterizations to visualize an accurate layout. Finally, Landry's expert faulted the original investigators for not excluding other possible ignition sources, while the State's expert said that they listed all such sources and evaluated the likelihood that each could cause a fire in the relevant time frame.

¶19    The postconviction experts agreed that Cognac, which Landry testified to having had at the previous night's party, is flammable and that "alcohol is miscible in water."[5] But they both also testified that they would have said "no" if they had been called at trial and asked if alcohol that had been spilled the previous day could have been the fuel for the fire. And both stated that it was unlikely that a cigarette on a bare mattress could have started the fire.

¶20    The court found that the experts disagreed about what arson investigators should consider in classifying a fire. Landry's expert did not read the trial transcript or Landry's statements to the police. He also asserted that even if a person stated the intent to burn a house, that statement would not be one of the factors that fire investigators should consider in deciding whether to classify a fire as arson. The State's expert, on the other hand, said arson investigators should consider circumstantial, nonfire related details of an investigation, such as witness statements, in classifying a fire. And the court found that the State's postconviction expert did consider such evidence.

¶21    Ultimately, the district court on remand dismissed Landry's claim with prejudice. Landry appeals that disposition.

---

5. The district court's findings state that miscible means that "[i]f alcohol were used to ignite a fire, and then firemen shot a lot of water on the scene, they would not expect lab testing to be able to determine that alcohol was used."

ISSUE AND STANDARD OF REVIEW

¶22    This case presents one issue: whether Landry's appellate counsel was ineffective for failing to bring a claim of ineffective assistance of trial counsel. Specifically, Landry contends that trial counsel was ineffective for failing to object to the admission of an accelerant detection canine's alerts and for failing to put on a nonarson defense through an independent arson expert who could testify on Landry's behalf or, at minimum, for failing to consult with an arson expert so as to be better prepared to highlight the weaknesses in the State's case. In reviewing a ruling on a petition for postconviction relief, we review the district court's findings of fact for clear error and its conclusions of law for correctness. *Tillman v. State*, 2005 UT 56, ¶ 14, 128 P.3d 1123.

ANALYSIS

¶23    Parties seeking postconviction relief under the PCRA will prevail if they show that they received ineffective assistance of counsel during the conviction, sentencing, or appellate phase of their criminal case. *See* Utah Code Ann. § 78B-9-104(1)(d) (LexisNexis 2012). Postconviction relief is warranted if "counsel's performance was deficient" and "the deficient performance prejudiced the defense." *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See also Kell v. State*, 2008 UT 62, ¶¶ 27–28, 194 P.3d 913 (employing the *Strickland* standard when reviewing a petition for postconviction relief that raised an ineffective assistance of counsel claim).[6] And we use the same

_____

6. The *Strickland* prejudice requirement is the same standard a petitioner must demonstrate to obtain postconviction relief. *See* Utah Code Ann. § 78B-9-104(2) (LexisNexis 2012) ("The court may not grant relief from a conviction or sentence unless the petitioner establishes that there would be a *reasonable likelihood of*

(continued…)

standard when a petitioner bases a claim of ineffective assistance of appellate counsel on appellate counsel's failure to raise a claim of ineffective assistance of trial counsel. *Kell*, 2008 UT 62, ¶ 42. The petitioner "has the burden of meeting both parts of" the ineffective assistance of counsel test. *State v. Templin*, 805 P.2d 182, 186 (Utah 1990).

¶24   Because Landry's claim is that appellate counsel was ineffective only for failing to raise trial counsel's ineffectiveness, whether appellate counsel provided ineffective assistance depends on whether trial counsel was ineffective. We therefore first assess trial counsel's performance according to *Strickland*, after which we address that of appellate counsel.

## I. Trial Counsel

A.   Trial Counsel's Performance Was Deficient.

¶25   To prove that counsel's performance was deficient, a claimant "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. Reasonableness is evaluated "under prevailing professional norms." *Id.* at 688. And while we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," a claimant who shows that under the circumstances there is no way that counsel's actions "might be considered    sound    trial    strategy"    will    overcome    that

---

(…continued)
*a more favorable outcome* in light of the facts proved in the post-conviction proceeding, viewed with the evidence and facts introduced at trial or during sentencing.") (emphasis added). Because we conclude that both trial counsel's and appellate counsel's errors prejudiced Landry under *Strickland*, *see infra* ¶¶ 39–43, 45, we conclude that the PCRA standard is also satisfied.

presumption. *Id.* at 689 (citation and internal quotation marks omitted).

¶26 Landry argues that trial counsel's performance was deficient for two reasons: (1) she "fail[ed] to object to the admissibility of an accelerant sniffing dog's alerts as substantive evidence of the presence of an ignitable liquid at the crime scene and on Landry's clothing when the alerts were uncorroborated by laboratory testing" and (2) she "fail[ed] to consult with an arson expert or call an arson expert to testify at trial" even though she "lacked experience or training regarding arson and the State's case relied primarily on expert testimony regarding arson."

¶27 First, we agree that trial counsel's failure to object to the admission of testimony about Oscar's alerts at the motel fell below the objective standard of reasonableness.[7] It is objectively unreasonable for counsel to forgo a valid objection to the admissibility of incriminating evidence, when that evidence provides no benefit to the defendant. *State v. Doutre*, 2014 UT App 192, ¶ 21, 335 P.3d 366. *See id.* ¶ 24 ("If clearly inadmissible evidence has no conceivable benefit to a defendant, the failure to object to it on nonfrivolous grounds cannot ordinarily be considered a reasonable trial strategy.").

---

7. Landry also argues that counsel should have objected to testimony regarding Oscar's alerts in the apartment. Because those alerts were corroborated by laboratory analysis, at least with respect to heptane, *see State v. Schultz*, 2002 UT App 366, ¶ 39, 58 P.3d 879 (permitting "testimony about canine detection . . . offered as substantive proof of the presence of an accelerant" if it is confirmed by a laboratory), and because we do not have to reach the issue given our disposition, we decline to address trial counsel's effectiveness with regard to Oscar's alerts in the apartment.

¶28   Here there was an obvious, nonfrivolous ground upon which trial counsel should have objected to the evidence of Oscar's alerts to the shoe and sock—evidence that not only had no benefit to Landry but which was also rather incriminating. In *State v. Schultz*, 2002 UT App 366, 58 P.3d 879, we concluded that, to be admissible, testimony about canine alerts on accelerants must either be corroborated by laboratory analysis or satisfy the test for admissibility of expert testimony. *Id.* ¶ 39. In *Schultz*, the prosecution's witnesses testified about a dog's alerts at the crime scene even though laboratory results for those samples were negative for accelerants. *Id.* ¶¶ 15–16. Although the *Schultz* court ultimately held that the trial court's admission of the dog's alerts was harmless because of the "significant amount of other evidence to support [the defendant's] conviction," *id.* ¶ 40, it first concluded that "if testimony about canine detection is offered as substantive proof of the presence of an accelerant, without laboratory confirmation, [a] three-part analysis . . . is required because such evidence is based on novel scientific principles and methods," *id.* ¶ 39. Specifically, where the State seeks to prove the presence of accelerants by testimony that an accelerant detection canine alerted without also providing corroborating laboratory results, the State must prove that (1) the alert is "inherently reliable," (2) the techniques used were "properly applied to the facts of the particular case by sufficiently qualified experts," and (3) the evidence of the alert is "more probative than prejudicial." *Id.* ¶¶ 27–29 (citations and internal quotation marks omitted). If the State does not satisfy these three elements, defense counsel should object to the admission of testimony about the alert on the authority of *Schultz*, unless there is some reason the evidence would benefit the defendant. *See Doutre*, 2014 UT App 192, ¶ 24.

¶29   During Landry's trial, the State called witnesses who testified to Oscar's alerts and who asserted that Oscar was more

sensitive than laboratory testing.[8] The district court found that the State used the alerts as evidence of arson. Yet the State provided no evidence that accelerant detection canine alerts generally, or Oscar's alerts on Landry's sock and shoe specifically, met the admissibility test for expert testimony outlined in *Schultz*. *See* 2002 UT App 366, ¶¶ 27–29. And Oscar's handler's testimony was, as noted above, quite incriminating. Not only did Oscar's alerts on the sock and shoe suggest to the jury that an accelerant was used, but it also tied the accelerant to Landry's person, undermining the defense's theory that perhaps someone other than Landry was responsible for causing the fire.

¶30    Yet trial counsel did not object. Instead, as spun by the State in its brief, she "dealt with the dog-alert evidence in cross-examination, showing its limitations both generally and in this case." On remand, the district court found that through cross-examination, trial counsel "elicited testimony that a general rule of thumb is that the error rate"—i.e., false alerts—of accelerant detection canines "is probably in the range of 10%." And in the evidentiary hearing on remand, the district court found that the reason Landry's counsel did nothing more to defend against the dog-alert testimony was that "she really didn't think about" it. Nonetheless, the State suggests her cross-examination was sufficient to constitute objectively reasonable representation. But while cross-examination can be an effective trial strategy, "we cannot conceive of a sound basis for failing to object" under *Schultz* "when it should have been obvious" that the State could not support the assertion that Oscar was a better source than laboratory testing for reliably discerning the presence of

---

8. The olfactory abilities of canines might in some respects be more sensitive than scientific equipment, as the Provo fire marshal testified, but whatever the sensitivity of a dog's nose, evidence of an accelerant detection canine's alerts has not yet been accepted as admissible proof of arson without independent corroborating laboratory testing. *Id.* ¶ 26.

accelerants in an evidentiarily significant way, *see Doutre*, 2014 UT App 192, ¶ 21, considering that *Schultz* expressly states that this is not the settled view of the scientific community, *see* 2002 UT App 366, ¶ 26 ("[I]f testimony concerning canine detection is used as substantive proof that an accelerant was used in a fire, without laboratory confirmation, such evidence is based on novel scientific principles or techniques.").

¶31 No reason has been suggested for why trial counsel would not object. And she could have objected without contradicting or interfering with her alternative defense that whatever the cause, Landry did not start the fire, because the two defenses "offered alternative grounds for reasonable doubt." *See Dugas v. Coplan*, 428 F.3d 317, 331 (1st Cir. 2005) ("'A tactical decision to pursue one defense does not excuse failure to present another defense that would bolster rather than detract from the primary defense.'") (brackets omitted) (quoting *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993)). Indeed, the only explanation we can fathom for trial counsel's failure to object to this harmful evidence is that "perhaps because of the lack of adequate preparation to meet [the State's] expert testimony, trial counsel failed to grasp the problems with the testimony and to object to it." *See Doutre*, 2014 UT App 192, ¶ 24. Her testimony during the evidentiary hearing on remand is not inconsistent with our surmise. Thus, we conclude that it was objectively unreasonable for trial counsel not to object under *Schultz* to the testimony of Oscar's uncorroborated alerts to the sock and shoe found in Landry's motel room.[9]

---

9. The State argues that under *State v. Clark*, 2014 UT App 56, 322 P.3d 761, trial counsel has no obligation to raise futile objections so it was not unreasonable for trial counsel not to object on the authority of *Schultz*. *See id.* ¶ 31. We do not agree that a *Schultz* objection to the handler's testimony about Oscar's alerts to the sock and shoe and to the Provo fire marshal's statement that "the dog is much more sensitive than some of the scientific

(continued…)

¶32   Second, we agree with Landry that trial counsel's failure to engage an expert of her own, at least to advise and possibly to testify, was also objectively unreasonable. Although we are generally reluctant to question trial strategy, including whether to call an expert witness, where "there is no reasonable basis for that decision," we will conclude there was deficient performance by trial counsel. *See State v. Tyler*, 850 P.2d 1250, 1256 (Utah 1993). *See also Houskeeper v. State*, 2008 UT 78, ¶¶ 39–40, 197 P.3d 636 (determining that counsel's performance was deficient because counsel failed to investigate or provide any expert or

---

(…continued)

equipment that we use"—implying that the alerts were credible despite the lack of corroborating laboratory analysis—would have been futile. Had trial counsel objected under the authority of *Schultz*, she likely would have prevailed in excluding the evidence because it was the State's burden, as the proponent of the evidence, to prove that the evidence of Oscar's alerts was admissible as substantive evidence. *See Schultz*, 2002 UT App 366, ¶ 27 (stating that to satisfy the first element "a proponent must" provide evidence of the alerts' foundation and reliability). Further, Landry has shown that the State likely could not have proven Oscar's alerts were inherently reliable because *Schultz* itself stands for the principle that accelerant detection canine alerts are not generally accepted in the scientific community. *See id.* ¶ 26. *See also Yell v. Commonwealth*, 242 S.W.3d 331, 345 (Ky. 2007) (Scott, J., concurring and dissenting) (cataloguing cases from across the United States, including *Schultz*, that determined "uncorroborated canine accelerant alerts . . . to be novel scientific evidence, not generally accepted in the scientific community of arson investigators"). And the State has not shown how it might have "'proffer[ed] a sufficient foundation to demonstrate the inherent reliability'" of accelerant-detection dog alerts generally or Oscar's alerts in particular. *See Schultz*, 2002 UT App 366, ¶ 27 (quoting *State v. Brown*, 948 P.2d 337, 340 (Utah 1997)).

character witnesses while the State presented at least four medical experts). The specific facts of a case may require trial counsel to investigate potential witnesses to determine whether such testimony would be appropriate. *See State v. Templin*, 805 P.2d 182, 187–88 (Utah 1990) (concluding that trial counsel's performance was deficient when counsel did not adequately investigate potential witnesses identified by the defendant because "a decision not to investigate cannot be considered a tactical decision. It is only after an adequate inquiry has been made that counsel can make a reasonable decision to call or not to call particular witnesses for tactical reasons."). *See also Dees v. Caspiri*, 904 F.2d 452, 454–55 (8th Cir. 1990) (per curiam) (stating that when expert evidence is critical to the case, "counsel ha[s] a duty to make a diligent investigation of the forensic evidence and its potential weaknesses" and "garner the expertise necessary to cross examine" the expert).

¶33 *Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005)—a case we referenced in the appeal from the initial dismissal of Landry's petition, *see Landry v. State*, 2012 UT App 350, ¶ 8, 293 P.3d 1092, and which the State makes no attempt to distinguish—demonstrates why an expert is needed in cases like Landry's. In our previous decision, we noted that *Dugas* supported at least further proceedings in this case. In *Dugas*,

> the defendant was convicted of arson for setting fire to [a] grocery store . . . . At trial, the prosecution called fire experts, who testified that the fire was intentionally set based on the lack of flame or charring damage expected from an electrical fire and the burn patterns on a pile of papers that indicated the pile had been tightly packed. Additionally, a canine trained to detect fire accelerants "alerted" to the pile of papers, some of which subsequently tested positive for ignitable liquids. The defendant's conviction was upheld on appeal, and he . . . [subsequently claimed]

ineffective assistance of counsel for inadequately pursuing a non-arson defense, particularly for not consulting an expert. . . . On review, the First Circuit . . . determined that counsel's failure to fully investigate a non-arson defense was deficient and prejudicial in this case for several reasons. For one, "challenging the state's arson case was critical to [the] defense" because the only other available defense—another suspect—was "difficult to mount and fraught with evidentiary problems." In addition, the state's case depended on arson evidence whose weaknesses would have been revealed by a thorough, expert-assisted defense investigation. The First Circuit also found it significant that although this was defense counsel's first arson case and he lacked knowledge of fire investigation principles, he decided to accept the state's characterization of the scene rather than seek guidance from an outside expert. Counsel's challenge to the state's experts therefore was limited to cross-examination . . . . But because of counsel's inexperience and unfamiliarity with arson, his cross-examination was unfocused and failed to challenge critical conclusions asserted by the state's experts. The First Circuit therefore concluded that counsel's failure to mount a non-arson defense, particularly his failure to consult an arson expert, "cannot be classified as a conscious, reasonably informed tactical decision" . . . .

*Id.* (final alteration in original) (internal citations omitted) (quoting *Dugas*, 428 F.3d at 320, 328–32).

¶34 With the benefit of the evidentiary hearing on remand and the district court's findings, we are now convinced that, as in *Dugas*, more was reasonably to be expected of trial counsel. First, as in *Dugas* where counsel was working his first arson case,

here trial counsel testified to having never before worked on an arson case and to relying on the limited knowledge that can be conveyed during continuing legal education courses (CLEs). On remand, the district court found that counsel had attended multiple CLEs that "touched on arson," but the court made no findings about, and the State does not point us to any place in the record that shows, how many CLEs she attended, how recent these CLEs were, or how extensively these CLEs dealt with effective strategies for defending arson cases. Thus, the findings and record in this case suggest counsel's prior experience did not independently provide her with the knowledge necessary to cast doubt on the State's case through effective cross-examination.

¶35   Second, despite trial counsel's inexperience, she made only minimal efforts to educate herself on fire investigation principles. The district court on remand found that the only arson expert with whom trial counsel met was the Provo fire marshal—the State's lead arson investigator. In effect, she "accept[ed] the state's characterization of the scene" just like counsel in *Dugas* had done. *See Landry*, 2012 UT App 350, ¶ 8 (discussing *Dugas*, 428 F.3d at 329–30). Even assuming the Provo fire marshal spoke objectively and candidly in sharing his views with Landry's trial counsel, she should have anticipated that the information he conveyed would have foretold his later testimony on behalf of the prosecution, given his obligation to testify truthfully. Obviously, he could not have helped her see the flaws in the State's experts' opinions when he would later testify to the validity of those opinions.

¶36   Third, we now know from the two postconviction experts that there were inadequacies in the State's investigation, of which trial counsel would have learned had she more thoroughly investigated the State's experts with the assistance of her own expert—an expert who could then have testified on behalf of Landry at trial. *See Templin*, 805 P.2d at 188. Specifically, had she secured the services of the expert who testified for Landry at the evidentiary hearing on remand, she

would have discovered that it was unclear whether the State's investigators employed the fire-investigation principles set out in NFPA 921; that the original investigators who testified for the State improperly concluded that the fire's burn pattern definitely proved ignitable liquids were poured on the floor; that if alcohol was spilled at a party it was not a problem that lab results did not find it because alcohol is miscible in water and would have disappeared when the firefighters used water to extinguish the fire, *see supra* note 5; that it was possible the original investigators improperly evaluated the potential fuel sources in the room, including the mattress; and that perhaps the State's experts improperly considered circumstantial evidence in classifying the fire as arson and that its origin should more properly have been classified as "undetermined."

¶37    Fourth, as a result of trial counsel's failure to consult her own expert, she missed the opportunity to understand the several problems with the State's case and to highlight them for the jury. According to the district court's findings, the only error in the State's experts' views that trial counsel was able to elicit through cross-examination was that "just because an investigator is not able to identify an accidental cause of the fire, it doesn't mean that it doesn't exist." Likewise, an independent investigation and consultation with her own expert might have pointed her to the scientific community's skepticism about accelerant detection canines, *see supra* ¶ 30 & note 9, which would have helped her exclude that evidence instead of merely eliciting testimony on cross-examination that such alerts have an error rate of about 10%. Thus, as in *Dugas*, discussion with and use of an independent expert would have allowed trial counsel to more effectively challenge the State's experts' conclusions.

¶38    Fifth, as in *Dugas*, where it was critical to challenge the State's theories because of the difficulty in the developing the theory that another suspect committed the arson, here it was critical to Landry's case that trial counsel effectively challenge the State's theory of the case and supporting expert testimony

because the other theories available to Landry's defense were "difficult to mount and fraught with evidentiary problems." *See Dugas*, 428 F.3d at 329. Trial counsel's alternative theories—that the fire was either caused by a cigarette dropped on a day-old alcohol spill or by a stranger—were only somewhat supported by the evidence. Both postconviction experts agreed that the cigarette-in-alcohol theory was weak, which suggests that if counsel had employed an expert, he or she would have advised against staking the defense case on this theory, which was only speculative in any event. Landry testified that he had a party the night before, which he never mentioned before trial, including during his interviews with investigators on the night of the fire. He testified that Cognac had been spilled and that the next day his girlfriend sat on his bed and smoked a cigarette. But Landry did not testify that his girlfriend actually dropped the cigarette into the spilled alcohol. Instead trial counsel relied on testimony, as stated in the district court's findings, from a State witness that "it is possible to start a fire with a discarded cigarette" to connect Landry's girlfriend's potentially-dropped-and-still-lit cigarette to the alcohol spill. Similarly, while the unidentified-arsonist theory was on firmer ground than such stories often are—after all, it was a disinterested neighbor who testified to seeing the unidentified man, not Landry—the man could not be found. And the neighbor said nothing about the man carrying gasoline, flicking a lighter, smoking a cigarette, or the like, although he did testify that, after he saw the man, he noticed that cardboard used as a temporary window replacement in a window frame next to Landry's front door had been pushed in. Thus, by not consulting an expert of her own, trial counsel forwent the opportunity to pursue a more effective trial strategy, instead pursuing theories that were much weaker. See *id.* at 329 (noting that the "someone else did it" defense is both weak and difficult to establish). Consequently, her representation of Landry was objectively deficient.

B.     Trial Counsel's Errors Prejudiced Landry.

¶39    "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland v. Washington*, 466 U.S. 668, 695 (1984). "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695–96. And when the other evidence in the case is "'less compelling' we 'will more closely scrutinize the conduct.'" *State v. Thompson*, 2014 UT App 14, ¶ 83, 318 P.3d 1221 (quoting *State v. Troy*, 688 P.2d 483, 486 (Utah 1984)).

¶40    Considering the totality of the evidence in this case, trial counsel's errors "had a pervasive effect" and "alter[ed] the entire evidentiary picture." *See Strickland*, 466 U.S. at 695–96. We conclude that a reasonable jury would have had a reasonable doubt but for trial counsel's deficient performance. We reach this conclusion for three reasons: (1) postconviction expert testimony revealed substantial errors in the State's arson case, which should have come out at trial; (2) under *Schultz*, trial counsel likely could have kept out Oscar's alerts to the sock and shoe; and (3) the jury's struggle to reach a decision at trial indicates that this was a close case—even with trial counsel's deficient performance. We now explain each reason more fully.

¶41    First, trial counsel's acceptance of the State's expert's characterization, instead of consulting independent experts, prejudiced Landry because it meant that she was unprepared to effectively cross-examine the State's witnesses, *see supra* ¶¶ 35–37, and that she did not introduce opposing expert opinion testimony regarding the investigation methods, origin, and cause of the fire. The reliability of the State's investigation and

the conclusions its experts drew as to the cause and point of origin of the fire were the cornerstones of the State's case. And, as expert testimony in the postconviction evidentiary hearing revealed, the investigation may not have been reliable. It was, for example, unclear whether the investigation was based on established fire-investigation principles, and it may not have taken full account of all of the fire's fuel sources. Landry's postconviction expert also testified about numerous other possible errors. Significantly, the State's experts' conclusions regarding the origin of the fire were erroneous, as they were based on a misunderstanding of the v-pattern on the floor and the effect of full-room involvement on such patterns. And trained experts disagreed as to whether the fire originated from poured ignitable fluid—making this fire the result of arson—or was more likely an accident. Further, other than the State's expert witnesses and Oscar's alerts, the State's only evidence implicating Landry was circumstantial, namely that he was being evicted, that he had left very few items in the apartment when he left,[10] that a lighter was found near the crime scene (although never connected to Landry), and that he was seen leaving the apartment five to ten minutes before the fire was reported. Where counsel's errors result in a failure to undermine evidence that "the State's case relied almost entirely upon" and where that evidence could easily have been undermined had counsel used appropriate judgment, we will conclude that the defendant was prejudiced. *See Thompson*, 2014 UT App 14, ¶¶ 84–86. *See also Dugas*, 428 F.3d at 331–32, 341 (concluding that "the crucial role of the arson evidence to the state's case" meant

---

10. We are not convinced that the lack of items in the apartment supports the State's case circumstantially because, although Landry acknowledged he was almost done moving, at least some of the items he left—prescription medications and financial documents—are not the sort of items a person would intentionally leave behind to burn.

counsel's failure to effectively challenge that evidence was prejudicial). Thus, if the jury had heard an arson expert testify that the cause of the fire was not necessarily arson and that, even if it was arson, the State's experts were wrong as to the origin and spread of the fire, the jury very likely would have entertained a reasonable doubt that Landry set fire to his apartment.

¶42    Second, had counsel objected, on the authority of *Schultz*, to the dog handler's testimony regarding Oscar's alerts to Landry's shoe and sock, the State would have been required to prove the reliability of Oscar's alerts—and it would have been difficult to do so. *See supra* ¶¶ 30–31 & note 9. Trial counsel likely would have been able to keep out the evidence of the alerts, *see State v. Schultz*, 2002 UT App 366, ¶ 27, 58 P.3d 879; *Yell v. Commonwealth*, 242 S.W.3d 331, 345 (Ky. 2007) (Scott, J., concurring and dissenting), as the State has not pointed us to any evidence of "'a sufficient foundation to demonstrate the inherent reliability of the underlying principles and techniques'" as an alternative way to prove the inherent reliability of Oscar's alerts, *Schultz*, 2002 UT App 366, ¶ 27 (quoting *State v. Brown*, 948 P.2d 337, 340 (Utah 1997)). And the testimony that Oscar was more reliable than lab tests, if allowed at all, would have appeared very questionable indeed. Thus, the State could likely not have satisfied the three-part test outlined in *Schultz*, and Oscar's alerts would not have come in as substantive evidence of ignitable fluid on Landry's sock and shoe. If Oscar's alerts had not come in as substantive evidence, there would have been no solid evidence directly connecting Landry to the cause of the fire alleged by the State: poured ignitable fluids.

¶43    Third, we know that even with evidence of Oscar's alerts and without the benefit of a contradicting expert, the jury still struggled in reaching the decision to convict. As we noted in our initial opinion affirming Landry's convictions, "at one point the jury was deadlocked." *State v. Landry*, 2008 UT App 461U, para. 3 n.1. And the trial record reflects that the jury only reached a

consensus *after* the court explained that it would have to come back to deliberate for an extra, unplanned day, causing a hardship for at least one juror, if it did not decide the case at that time. This demonstrates that the jury struggled to reach its decision, making it much more likely that it would have reached a different conclusion but for trial counsel's ineffectiveness.

## II. Appellate Counsel

¶44    Finally, "[t]o show that appellate counsel was ineffective in failing to raise a claim, [Landry] must show that the issue [was] obvious from the trial record and . . . probably would have resulted in reversal on appeal." *Kell v. State*, 2008 UT 62, ¶ 42, 194 P.3d 913 (third alteration and omission in original) (citation and internal quotation marks omitted).

¶45    In the previous appeal, we determined that "[t]he prejudice resulting from appellate counsel's failure to raise a claim of ineffective assistance of trial counsel . . . is . . . automatic" when, "but for trial counsel's ineffectiveness, it was reasonably likely that [Landry] would not have been convicted." *Landry v. State*, 2012 UT App 350, ¶ 11, 293 P.3d 1092.

> If trial counsel's deficiencies were prejudicial, appellate counsel's failure to raise those deficiencies is necessarily prejudicial in the same way and to the same extent. The prejudice from Landry's claim that appellate counsel was deficient in failing to assert on appeal trial counsel's ineffective representation is therefore implicit in his argument that he was prejudiced by trial counsel's deficient performance.

*Id.* Because we conclude that trial counsel's deficient performance prejudiced Landry, we conclude that appellate counsel's failure to raise a claim of ineffective assistance of trial

counsel on appeal was likewise objectively deficient and prejudicial.

CONCLUSION

¶46  We conclude that trial counsel's performance was deficient and that there is a reasonable probability that, without this deficiency, the jury would have reached a more favorable outcome for Landry; therefore, we also conclude that Landry has established ineffective assistance of appellate counsel. Thus, Landry is entitled to appropriate relief under the PCRA. This relief would ordinarily be a new trial with the assistance of new counsel, who would presumably engage a qualified expert and object under the authority of *Schultz* to much of the State's case. But because Landry is no longer imprisoned and has relocated to Texas, or so we were advised at oral argument,[11] it is far from clear that this would be a reasonable use of judicial resources or even something Landry would welcome. We therefore remand to the district court to implement an appropriate remedy under the circumstances.

———————

11. According to the sentencing report, which is not a part of the record in this case but of which we take judicial notice, Landry was sentenced on August 16, 2006, to an indeterminate sentence of five years to life. We were advised at oral argument that he was paroled from the Utah State Prison in February 2014.